USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1206 RICHARD L. WRIGHT, Plaintiff, Appellant, v. ERNEST C. PARK, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Peter A. Anderson for appellant. _________________ Michael M. DuBose, Assistant United States Attorney, with _________________ whom Jay P. McCloskey, United States Attorney, and George P. _________________ _________ Dilworth, Assistant United States Attorney, were on brief, for ____________________________________________ appellees. _________________________ October 4, 1993 _________________________ SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. ______________ consider whether civil rights actions can be maintained against military officers in the chain of command by persons employed under the National Guard Technician Act of 1968 (Technician Act), 32 U.S.C. 709 (1988). The district court granted summary judgment because it deemed plaintiff's claims to be nonjusticiable. See Wright v. Park, 811 F. Supp. 726 (D. Me. ___ ______ ____ 1993). Although our reasoning differs from that of the court below, we affirm. I. BACKGROUND I. BACKGROUND The facts, insofar as they are germane to this proceeding, are not seriously disputed. Plaintiff-appellant Richard L. Wright served from 1970 to 1990 in a dual civilian- military capacity as a technician at the Air National Guard (ANG) base in Bangor, Maine. Wearing his civilian hat, appellant served during the last three years of the period as an aircraft maintenance specialist. Wearing his military hat, he served during that same period as deputy commander for maintenance, 101st Air Refueling Wing, and as a colonel in the Maine ANG. In these positions, appellant supervised approximately 450 persons attached to the maintenance unit, including 130 technicians. His primary mission was to keep Bangor-based military aircraft in a state of combat preparedness, and to train others to do the same. On March 2, 1990, Major General Ernest Park notified appellant of his forthcoming reassignment to the position of flight instructor. In compliance with Technician Personnel 2 Regulation No. 15, 2-5,1 Park's letter informed appellant that, if he abjured reassignment, the letter itself would be deemed to operate as a 30-day termination notice. Appellant did not welcome the news: while the proposed shift in duties endangered neither his pay nor his benefits, it promised to remove him from the maintenance unit and divorce him from all supervisory responsibilities. Consequently, appellant rejected the reassignment. In due course, the threatened termination became a reality. Park relieved appellant of his duties as a civilian aircraft maintenance specialist and as deputy commander for maintenance, while leaving intact his military rank. His several hats askew, appellant brought suit in federal district court against General Park and others presumably responsible for cashiering him. He claimed that his habitual whistleblowing during his tenure as maintenance officer, he had filed repeated reports of safety violations, as well as a report charging General Park with the unauthorized use of military aircraft prompted a cabal of high-ranking officers to retaliate against him and, ultimately, strip him of his job.2 His second amended complaint (the operative document for our purposes) alleges that the named defendants Generals Park, Eremita, and ____________________ 1Regulation No. 15, promulgated by the Secretaries of the Army and Air Force pursuant to 32 U.S.C. 709(a) (1988), covers a wide range of personnel matters. Section 2-5 thereof addresses non-disciplinary, management-directed reassignments of persons employed under the Technician Act. 2Defendants deny these charges, contending that appellant's reassignment was justified by discipline problems within the maintenance unit and by the need to bolster flagging morale. 3 Durgin, and Colonel Hessert thereby violated the Civil Rights Act, 42 U.S.C. 1983, 1985 (1988), the federal whistleblower statute, 5 U.S.C. 2301-2302 (1988), and the state whistleblower law, 26 M.R.S.A. 831-840 (1988). The federal district court consolidated the case with a related case.3 On January 26, 1993, the court granted defendants' motion for summary judgment, holding in substance that the dispute concerned a nonjusticiable military controversy. See Wright v. Park, 811 F. Supp. at 732. It reached this result ___ ______ ____ by applying the analytic framework first suggested in Mindes v. ______ Seaman, 453 F.2d 197, 201-02 (5th Cir. 1971), and subsequently ______ adopted by this court in Penagaricano v. Llenza, 747 F.2d 55, 60- ____________ ______ 61 (1st Cir. 1984). The appeal from the district court's judgment presents a pair of interrelated issues: separability and justiciability. Thus, we must make two inquiries: Assuming defendants discriminated against appellant, can appellant be said to have suffered injury in his capacity as a civilian worker, independent of his military role? (2) If not, i.e., if appellant was ____ ____________________ 3An investigator for the Maine Human Rights Commission found reason to believe that defendants discriminated against appellant, and the Commission joined with appellant to bring suit in federal district court. A parallel state action was removed to federal court and then consolidated with the original action. After the Maine Supreme Judicial Court held that the state whistleblower law does not pertain to National Guard personnel, see Maine Human Rights Comm'n v. Maine Dep't of Defense & ___ ___________________________ ___________________________ Veterans' Servs., 627 A.2d 1005 (Me. 1993), the Commission _________________ dropped its appeal from the judgment below. The parties agree that the state-law issues are now moot and, consequently, we do not address them. 4 injured, rather, in his military capacity, can his injury form the basis for a justiciable civil rights claim against the defendants (all of whom are military officers)? To complicate matters, answering the second query will require us to reexamine our governing precedent on justiciability in light of recent case law elsewhere. II. AN OFFICER AND A GENTLEMAN II. AN OFFICER AND A GENTLEMAN Appellant, who remains a colonel in the ANG, argues strenuously that, for purposes of this case, his civilian status may be disentangled from his military status, and that he should be free to sue for discrimination implicating the former. But this balkanization of technicians' work is belied by Congress's description of the functions that ANG technicians serve, by the unmistakable intendment of the Technician Act (the statute that Congress enacted in 1968 to regulate such personnel), and by the resulting ties that bind technicians' civilian and military roles. The Technician Act makes technicians eligible for military employment benefits and, in so doing, seeks to improve national security by facilitating the recruitment of qualified individuals. See American Fed'n of Gov't Employees v. FLRA, 730 ___ _________________________________ ____ F.2d 1534, 1542-47 (D.C. Cir. 1984) (analyzing legislative history). The Act provides in relevant part that persons may be employed as technicians only "[u]nder regulations prescribed by the Secretary of the [relevant military branch]. . . ." 32 U.S.C. 709(a). Each such technician "shall, while so employed, 5 be a member of the National Guard and hold the military grade specified by the Secretary concerned for that position." 32 U.S.C. 709(b). In substance, then, the Technician Act evidences Congress's intention that technicians, while retaining their positions as civil employees outside the competitive civil service, will serve simultaneously as employees of the appropriate military department, subject to its regulation. It is axiomatic that the National Guard is military in character. See H.R. Rep. No. 1823, 90th Cong. 2d Sess., ___ reprinted in 1968 U.S.C.C.A.N. 3318, 3319 (recognizing the _________ __ "military characteristics of the National Guard"). We think it follows that technicians are martial in character. Indeed, under the Technician Act's composite regime, technicians are considerably more than nominal members of the military establishment. In referring to the National Guard's mission, Congress termed it "essential" as a matter of "military policy" that "the strength and organization of the [National Guard] as an integral part of the first line defenses of the United States be maintained and assured at all times." 32 U.S.C. 102. Because National Guard technicians serve as the Guard's support staff and are, in fact, those whose job it is to maintain and assure the Guard's strength and organization, they are indispensable to this nation's defense. See, e.g., 32 U.S.C. 709(a) (assigning to ___ ____ technicians such distinctively military tasks as "(1) the administration and training of the National Guard; and (2) the maintenance and repair of supplies issued to the National Guard 6 or the armed services"). Nor do technicians merely perform tasks that have a military ring to them; the record reflects that fully one-half of appellant's outfit, the 101st Air Refueling Wing, served in Operation Desert Storm or Desert Shield. Given this mise-en-scene, it is unsurprising that, no ____ __ _____ matter the context, every court having occasion closely to consider the capacity of National Guard technicians has determined that capacity to be irreducibly military in nature. See, e.g., Stauber v. Cline, 837 F.2d 395, 399 (9th Cir.), cert. ___ ____ _______ _____ _____ denied, 488 U.S. 817 (1988); Illinois Nat'l Guard v. FLRA, 854 ______ ____________________ ____ F.2d 1396, 1398 (D.C. Cir. 1988); American Fed'n, 730 F.2d at ______________ 1545-46; New Jersey Air Nat'l Guard v. FLRA, 677 F.2d 276, 279 ___________________________ ____ (3d Cir.), cert. denied, 459 U.S. 988 (1982); Nesmith v. Fulton, _____ ______ _______ ______ 615 F.2d 196, 200-01 (5th Cir. 1980). We, too, conclude that, since National Guard technicians' positions are encompassed within a military organization and require the performance of work directly related to national defense, such positions are themselves military in nature. Appellant strives valiantly to elude the grasp of this logic. He says that his situation is different; it falls outside the mine run of previous cases because he was ousted from his civilian employment without being terminated from his military post. This asseveration cannot withstand scrutiny. For one thing, appellant mischaracterizes his own situation: though he retains his commission as a colonel in the ANG, the injury of which he complains has had repercussions 7 beyond the loss of his civilian mantle. He also has been dismissed from the post of deputy commander for maintenance a post which he admits is military in nature. For another thing, appellant's self-portrait, even as he has painted it, is not an original. In Nesmith, for example, the plaintiff lost his _______ civilian post prior to the eventual loss of his military post. Nesmith, 615 F.2d at 197. The court took care to analyze the _______ initial dismissal independently, yet reached the same conclusion as other courts that have considered the question: an ANG technician's two identities are not scissile. See id. at 201; ___ ___ see also Stauber, 837 F.2d at 399 (holding that an injury ___ ____ _______ occurring in the course of plaintiff's civilian employment as an ANG technician arose incident to military service); cf. New ___ ___ Jersey Air Nat'l Guard, 677 F.2d at 279 (holding that the _________________________ Technician Act grants adjutants general final discretion relating to discipline and discharge of ANG technicians). We rule, therefore, that while a technician's job is a composite, containing both civilian and military pieces, the job's dual aspects are inseparable; they are, like Chang and Eng, joined at the chest. And from the fact that the technician's several roles are inextricably intertwined, it follows that the adverse employment action against which appellant inveighs necessarily implicates his military as well as his civilian status. In other words, Colonel Wright, for present purposes, is both an officer and a gentleman. III. NO CLEARANCE FOR TAKEOFF III. NO CLEARANCE FOR TAKEOFF 8 Having answered the separability question in the negative, we proceed to the question of justiciability. The touchstone of our inquiry is Chappell v. Wallace, 462 U.S. 296 ________ _______ (1983). Chappell held that "[t]aken together, the unique ________ disciplinary structure of the Military Establishment and Congress' activity in the field constitute `special factors' which dictate that it would be inappropriate to provide enlisted military personnel with a Bivens-type remedy against their ______ superior officers." Id. at 304 (citation omitted).4 The ___ Chappell Court placed particular emphasis on the first of these ________ two factors: The special nature of military life the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command. Here, as in Feres [v. United _____ ______ States, 340 U.S. 135 (1950)], we must be ______ "concern[ed] with the disruption of `[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court." Id. (citations omitted). ___ Chappell broke new ground, and courts across the nation ________ ____________________ 4When the Chappell Court wrote about a "Bivens-type" remedy, ________ ______ it had in mind Bivens v. Six Unknown Named Agents of the Federal ______ _______________________________________ Bureau of Narcotics, 403 U.S. 388 (1971). Bivens is the case ____________________ ______ establishing, as a general proposition, that victims of a constitutional violation perpetrated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits. See Carlson v. ___ _______ Green, 446 U.S. 14, 18 (1980) (restating Bivens rule); Morales v. _____ ______ _______ Ramirez, 906 F.2d 784, 786 (1st Cir. 1990) (same). _______ 9 vigorously debated whether to read it narrowly, based on its holding, or to read it broadly, based on its reasoning. See ___ Jorden v. National Guard Bureau, 799 F.2d 99, 107 (3d Cir. 1986) ______ _____________________ (surveying case law), cert. denied, 484 U.S. 815 (1987). Within _____ ______ a year after Chappell emerged, this court decided Penagaricano, ________ ____________ 747 F.2d 55, a case involving facts similar to those we sift today. There, an ANG technician, having been discharged, alleged a conspiracy to end his employment in retaliation for his political ideas and affiliations. See id. at 58. In upholding ___ ___ the dismissal of plaintiff's claim, we took pains to acknowledge the relevance of Chappell's emphasis on "the importance of the ________ military's decisionmaking autonomy," id. at 59, took into account ___ the factors identified by Chappell as counselling against ________ justiciability in the military context, id. at 59-60, and noted ___ that Chappell suggested a "predisposition to decline review," id. ________ ___ at 64. Nevertheless, believing that the holding in Chappell ________ should be confined to the context of enlisted personnel suing superior officers, we declined to cede it controlling effect. See id. at 59. Thus, although we ultimately found Penagaricano's ___ ___ claim to be nonjusticiable, we based that finding not on Chappell ________ but on an application of the balancing test limned by the Fifth Circuit in Mindes, 453 F.2d at 201-02. See Penagaricano, 747 ______ ___ ____________ F.2d at 60-61. Time has shed new light on the debate over Chappell's ________ doctrinal reach. In United States v. Stanley, 483 U.S. 669 _____________ _______ (1987) a case which the Court accepted for review specifically 10 to resolve the controversy over the proper dimensions of Chappell, see id. at 676 the Justices came down on the side of ________ ___ ___ the broad constructionists. While conceding that "no holding can be broader than the facts before it," and that some of Chappell's ________ language focused explicitly on the officer/subordinate dichotomy, id. at 680, the Stanley Court pointed out that Chappell had self- ___ _______ ________ consciously patterned its analysis after Feres the case that _____ barred tort liability for injuries that "arise out of or are in the course of activity incident to [military] service." Stanley, _______ 483 U.S. at 684 (quoting Feres, 340 U.S. at 146). Given this _____ symbiotic relationship between Feres and Chappell, the Stanley _____ ________ _______ Court concluded that the Chappell approach should apply to all ________ activities performed "incident to service" rather than merely to activities performed within the officer/subordinate sphere. Stanley, 483 U.S. at 680-81. In this sense, then, Stanley both _______ _______ "reaffirm[ed] the reasoning of Chappell," id. at 683-84, and ________ ___ widened the scope of its holding. Of critical importance for present purposes, Stanley _______ makes pellucid that the exception to Bivens liability established ______ by Chappell is coextensive with the exception to tort liability ________ established by Feres and its progeny.5 Consequently, "no Bivens _____ ______ remedy is available for injuries that "arise out of or are in the ____________________ 5To call the Feres doctrine an exception is an _____ oversimplification. Feres is a judge-made exception to the _____ Federal Tort Claims Act, 28 U.S.C. 1346, 2671-2680 (1988 & Supp. II 1990), itself a statutory waiver of sovereign immunity from tort liability. Thus, if tort liability is the rule, Feres _____ created an exception to an exception to an exception. 11 course of activity incident to service." Id. at 684. We now ___ join several of our sister circuits in accepting this bright-line rule as the definitive statement on the justiciability of civil rights claims in the military context, including the National Guard.6 And, being reluctant to leave "derelicts on the waters of the law," Alabama Pub. Serv. Comm'n v. Southern Ry. Co., 341 __________________________ ________________ U.S. 341, 357 (1951) (Frankfurter, J., concurring), we overrule Penagaricano to the extent that it mandates a different rule.7 ____________ ____________________ 6See, e.g., Maddick v. United States, 978 F.2d 614, 615 ___ ____ _______ ______________ (10th Cir. 1992); Kitowski v. United States, 931 F.2d 1526, 1529 ________ _____________ (11th Cir.), cert. denied, 112 S. Ct. 371 (1991); Watson v. _____ ______ ______ Arkansas Nat'l Guard, 886 F.2d 1004, 1006-07, 1009-10 (8th Cir. ____________________ 1989). We would add, moreover, that several courts, even without the benefit of Stanley's clarification of Chappell, anticipated _______ ________ Stanley and adopted a per se prohibition of damages actions _______ ___ __ brought against military officers for alleged violations of subordinates' civil rights. See, e.g., Jorden, 799 F.2d at 107; ___ ____ ______ Trerice v. Summons, 755 F.2d 1081, 1084 (4th Cir. 1985); Mollnow _______ _______ _______ v. Carlton, 716 F.2d 627, 630 (9th Cir. 1983), cert. denied, 465 _______ _____ ______ U.S. 1100 (1984); see also Martelon v. Temple, 747 F.2d 1348, ___ ____ ________ ______ 1350 (10th Cir. 1984), cert. denied, 471 U.S. 1135 (1985). Most _____ ______ significantly for our purposes, the Fifth Circuit, progenitor of the Mindes multifactor test, has abandoned that approach in favor ______ of a per se prohibition. See Crawford v. Texas Army Nat'l Guard, ___ __ ___ ________ ______________________ 794 F.2d 1034, 1036 (5th Cir. 1986). In short, Mindes has been ______ banished from its homeland. 7Although panel decisions of this court are ordinarily binding on newly constituted panels, that rule does not obtain in instances where, as here, a departure is compelled by controlling authority. In such relatively rare instances, we have sometimes chosen to circulate the proposed overruling opinion to all members of the court prior to publication even though the need to overrule precedent is reasonably clear. See, e.g., Trailer ___ ____ _______ Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 9 n.5 (1st ______________________ ______________ Cir. 1992). This procedure is, of course, informal, and does not preclude a suggestion of rehearing en banc on any issue. We have followed that praxis here and can report that none of the judges of this court has objected to the panel's analysis or to its conclusion that the justiciability regime limned in Penagaricano has outlived its usefulness as precedent. ____________ 12 Of course, Wright's suit invoked the Civil Rights Act rather than following the Bivens route. But absent a specific ______ statutory provision to the contrary, there is no principled basis for according state actors sued under 42 U.S.C. 1983 a different degree of immunity than would be accorded federal actors sued for an identical abridgement of rights under Bivens. ______ See Butz v. Economou, 438 U.S. 478, 500 (1978). Thus, while the ___ ____ ________ Stanley Court's clarification of Chappell occurred in the context _______ ________ of a Bivens action, Stanley can only be understood to apply ______ _______ equally to civil rights claims against state officials under section 1983 and, for that matter, under kindred statutes. See ___ Watson v. Arkansas Nat'l Guard, 886 F.2d 1004, 1007 (8th Cir. ______ _____________________ 1989) (collecting cases construing Chappell rule to cover suits ________ brought under section 1983). The federal whistleblower statute, 5 U.S.C. 2301-2302, relied on by appellant in association with his civil rights claims, is a statute that falls comfortably within this generality. Hence, the district court appropriately declined to clear the case for trial. IV. CONCLUSION IV. CONCLUSION We need go no further. Since a technician's dual roles are too tightly imbricated to be pried apart at a litigant's whim, appellant necessarily suffered the injury of which he complains in his military capacity. See supra Part II. For that ___ _____ reason, the injury arose incident to military service. See supra ___ _____ Part III. In these circumstances, Stanley applies, and, under _______ the Stanley rule, the statements of claim contained in _______ 13 appellant's second amended complaint fail the test of justiciability.8 Affirmed. Affirmed. ________ ____________________ 8Because appellant's suit is nonjusticiable, we need not consider other potential deficiencies in appellant's case, e.g., ____ whether the defendants can be said to have acted under color of state law. 14