# United States Court of Appeals

## For the First Circuit

————————————

No. 98-2053

EUGENE E. WIGGINTON,

Plaintiff, Appellant,

v.

REGINALD A. CENTRACCHIO, ET AL.,

Defendants, Appellees.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

————————————

Before

Torruella, Chief Judge,

Cyr, Senior Circuit Judge,

and Pollak,[*] Senior District Judge.

————————————

Robert B. Mann and Mann & Mitchell on brief, for appellant.
Leonard J. DePasquale, Staff Judge Advocate, Rhode Island Army
National Guard, and Richard B. Woolley, Assistant Attorney General,
Department of Attorney General, on brief, for appellees.

————————————

———————————

[*] Of the Eastern District of Pennsylvania, sitting by designation.

March 13, 2000
_____

**Pollak, District Judge**.  This case involves a claim by the plaintiff - the appellant in this court - that his status as a commissioned officer in the Rhode Island Army National Guard was wrongfully terminated.  Plaintiff challenged that termination by suit brought, pursuant to 42 U.S.C. § 1983, in a Rhode Island state court against two defendants - appellees in this court - the Adjutant General of the Rhode Island Army National Guard and the State of Rhode Island. The suit was removed to the United States District Court for Rhode Island.  Following brief discovery, the District Court granted the Adjutant General's motion for summary judgment and entered judgment in favor of both defendants.  This appeal followed.

## I.

## A.

The facts giving rise to the plaintiff-appellant's claim are straightforward and may be quickly stated:

Eugene E. Wigginton served in the United States Marine Corps from April of 1967 to September of 1970, when he was honorably discharged.  Nine years later - in July of 1979 - the plaintiff received a commission as a Second Lieutenant in the United States Army Reserve.  As concomitants of his status as a commissioned reserve officer, Lieutenant Wigginton was appointed an officer of the United States Army National Guard ("USANG") and of the Rhode Island Army National Guard ("RIANG"), with assignment to a RIANG Military Police

-3-

unit.  As the years went by, Lieutenant Wigginton received periodic

promotions, reaching the rank of major in 1989.  In January of 1996,

Major Wigginton (by then assigned as a Public Affairs Officer and

serving as a RIANG Education Officer) was nearing completion of twenty

years of military service (more than three years in the Marines, and

almost seventeen years in USANG and RIANG).  In that month he received

from Brigadier General Reginald A. Centracchio, Adjutant General of

Rhode Island, a memorandum  captioned "Consideration for Selective

Retention."  The memorandum advised Major Wigginton that his status

would be considered in May of 1996 by a Selective Retention Board,

convened pursuant to National Guard Regulation ["NGR"] 635-102 - a

regulation, promulgated in 1988, titled "Personnel Separations OFFICERS

AND WARRANT OFFICERS SELECTIVE RETENTION."  The Selective Retention

Board, according to General Centracchio's memorandum, would "consider

commissioned and warrant officers in the grade of colonel and below who

have completed 20 years of qualifying service for retired pay."  A

principal goal of the selective retention process is "[e]nsuring that

only the most capable officers are retained beyond 20 years of

qualifying service for assignment to the comparatively few higher level

command and staff positions."  NGR 635-102 § 3(a).[1] Meeting on May 13,

---

[1] As the District Court explained: "'Selective retention' is a policy
instituted by the United States Army through which officers in the
USANG who have completed 20 years of commissioned service are
reevaluated at regular intervals to determine whether they should be
retained for further service.  The program is designed to ensure combat

1996, the Board convened by General Centracchio considered the records of ten officers.  Major Wigginton (and presumably the other nine officers) did not appear before the Board; NGR 635-102 states that "[i]ndividuals are not authorized to appear."  Via a memorandum to General Centracchio dated May 13, the Board recommended that six officers be retained and that four officers, of whom Major Wigginton was one, not be retained.  On the following day - May 14, 1996 - General Centracchio sent Major Wigginton a memorandum stating, inter alia, that "[y]ou have been considered for retention in accordance with [NGR 635-102] and have not been selected.  Accordingly, you will be separated from the Army National Guard by 13 July 1996."  On July 18, 1996, Colonel Anthony J. Zoglio, director of personnel for RIANG, sent Major Wigginton a memorandum advising him that, effective July 13, he had been separated from the Army National Guard by honorable discharge. At the time of his discharge, Major Wigginton was a Public Affairs Officer, serving as Education Officer of RIANG; he was forty-six years old.

### B.

In September of 1996, Major Wigginton brought suit in the Rhode Island Superior Court against General Centracchio and the State

---

readiness throughout the entire National Guard and to inhibit stagnation in the senior grades."

of Rhode Island.  The suit, in two counts, was brought pursuant to 42 U.S.C. § 1983.

The first count alleged that plaintiff's separation from the service, and his consequent ineligibility for promotion to lieutenant colonel, contravened Section 30-3-13 (1994 Reenactment) of Rhode Island General Laws.  Section 30-3-13 provides as follows:

> All commissioned officers of the staff corps and departments, hereafter appointed, shall have had previous military experience, except chaplains, officers of the judge advocate general's corps, and medical corps officers.  They shall hold their positions until they shall have reached the age of sixty (60) years, unless retired prior to that time by reason of resignation or disability, or for cause to be determined by an efficiency board or a court-martial legally convened for that purpose.  Vacancies among these officers shall be filled by appointment from the commissioned officers of the national guard or from such other civilians as may be specifically qualified for duty therein.

Major Wigginton's contention was that - absent resignation, disability, or separation "for cause," none of which has occurred - the quoted statute had conferred upon him tenure as a commissioned officer of RIANG (albeit, not of USANG) until he should attain the age of sixty. It follows - so Major Wigginton contended - that termination of his tenure as a RIANG officer was abridgement, without due process of law, of a vested property right.

The second count, also predicated on § 1983, alleged a denial of due process of law in that "[a]t no time has the plaintiff ever been informed of the reasons why he was not selected for retention . . . ."[2]

By way of relief, Major Wigginton sought "a preliminary and permanent injunction ordering the defendant[3] to reinstate the plaintiff in the Army National Guard, restore to him all his rights and privileges to which he is entitled by reason of his commission, including any back pay, and submit the plaintiff's name to the promotion board for Lieutenant Colonel." (Although the language of Major Wigginton's prayer for relief appears broad enough to encompass reinstatement, and associated entitlements, in USANG as well as in RIANG, Major Wigginton's brief on appeal expressly acknowledges that "[t]he relief this Plaintiff seeks is limited to the Rhode Island National Guard.") The complaint also sought attorney's fees and costs. Based on plaintiff's federal claims, defendants removed the case to the United States District Court for Rhode Island. General Centracchio

---

[2] The second count also alleged that "the criteria set forth in National Guard Regulation 635-102 [to be considered in determining whether or not a person should be retained in the National Guard] were not followed with respect to plaintiff's case." However, plaintiff has not pursued this claim on appeal.

[3] Here and elsewhere in his pleadings plaintiff employs the singular "defendant," notwithstanding that there are two named defendants – General Centracchio and the State of Rhode Island.

then moved to dismiss.[4]    The District Court referred the case to a Magistrate Judge, who recommended dismissal for lack of justiciability. The Magistrate Judge was of the view that the case at bar, a § 1983 action brought by a subordinate military officer against a military superior and arising out of military service, was barred by this court's decision in Wright v. Park, 5 F.3d 586 (1st Cir. 1993). Wright v. Park, building on Supreme Court precedent that had barred so-called "Bivens actions"[5] against federal officials for constitutional violations when such actions arise in a military setting, held that § 1983 actions of the same character against state officials were likewise barred. The Magistrate Judge concluded that "the Wright court adopted the following bright-line rule: actions against military officers for injuries that are 'incident to service' are not justiciable, whether these actions are filed pursuant to § 1983 or Bivens." Accordingly, the Magistrate Judge recommended dismissal of the complaint. Disagreeing with the Magistrate Judge, the District Court concluded that plaintiff's claims were justiciable. The District Court held that Wright v. Park is a bar to damage actions but not to

---

[4]  The State of Rhode Island did not join in - or file a separate - motion to dismiss.  See infra note 6.

[5]  The term "Bivens actions" derives from Bivens v. Six Unknown Federal Agents, 403 U.S. 388 (1971), authorizing damage actions against federal officials who allegedly engaged in unconstitutional conduct to a plaintiff's detriment.

actions - of which Major Wigginton's reinstatement suit is an example - in which the relief sought is equitable in nature.

Following the District Court's ruling that Major Wigginton's suit was justiciable, the parties and the District Court turned their attention to the substance of Major Wigginton's claims.

The claim presented by Major Wigginton's first count was that termination of his status as a RIANG officer deprived him, without due process of law, of a property right created by the mandate of Rhode Island state law. See R.I. Gen. Laws § 30-3-13 ("[A]ll commissioned officers of the staff corps and departments . . . shall hold their positions until they have reached the age of sixty years.") The parties were in flat disagreement as to the proper construction of the Rhode Island statute. The defense contended that the statute was inapplicable because Major Wigginton was not an officer "of the staff corps and departments." Major Wigginton contended that he was. Accordingly, the District Court authorized discovery for the limited purpose of providing the parties with an enhanced opportunity to elucidate the meaning of that statutory phrase. At the close of discovery, both General Centracchio and Major Wigginton moved for summary judgment.[6]

---

[6] Notwithstanding that the State of Rhode Island is a named defendant in this litigation, the State did not join General Centracchio's motion for summary judgment. See infra note 7.

The District Court filed an opinion which reaffirmed its prior ruling on justiciability but found against Major Wigginton on both counts of his complaint - the first count's due process claim based on R.I. Gen. Laws § 30-3-13 and the second count's claim that the Selective Retention Board and General Centracchio had denied Major Wigginton due process by not explaining to him the reasons for his non-retention. Accordingly, the District Court granted the summary judgment motion of General Centracchio, denied that of Major Wigginton, and entered judgment against Major Wigginton and in favor of General Centracchio and the State of Rhode Island.[7]

With respect to Major Wigginton's claim under the first count - i.e., the claim that he had a protected property right arising under R.I. Gen. Laws § 30-3-13 of which he could not be deprived without due process of law - the District Court stated:

> Plaintiff presents the affidavit of Brigadier General Thomas M. Frazer, RIANG (Ret.), an authority on Rhode Island military history. At plaintiff's request, General Frazer reviewed the Military Code of Rhode Island and found it to be "archaic and woefully outdated." Although General Frazer educated the court as to the historical distinctions between line, staff, and general officers, he was unfamiliar with any "staff corps" in the Rhode Island National Guard,

---

[7] The docket sheet establishes that, concurrently with the grant of General Centracchio's motion for summary judgment, judgment was entered in favor of both defendants. On this appeal, a single brief has been filed for General Centracchio and the State of Rhode Island. (The docket sheet does not reflect any challenge to the inclusion of the State of Rhode Island as a named defendant).

-10-

and he could only speculate as to what was meant by "and departments." Speaking specifically about the text of R.I. Gen. Laws § 30-3-13, Frazer stated quite candidly, "I have no thought or idea what the writer was trying to convey to the reader . . . ." The defendant's attempt to discover the meaning of "staff corps" was no more fruitful. Colonel Rick Baccus, director of personnel and speaking on behalf of the RIANG, was himself hard-pressed to explain to what the expression "staff corps and departments" refers.

Of course, in this case, it is incumbent on Major Wigginton to establish that he was a member of the "staff corps and departments." Even he cannot say with any conviction that he held any such commission. In fact, although Major Wigginton at one time "believed" he was a member of the staff corps, he now admits that he was "never an officer of a corps identified as staff corps officer." On this basis, Major Wigginton's substantive due process claim must fail.

In addressing Major Wigginton's argument under the second count that due process required a statement of reasons for his non-retention, the District Court noted Major Wigginton's reliance on State v. Ouimette, 367 A.2d 704 (R.I. 1976), a Rhode Island Supreme Court decision holding that an applicant for parole has a due process entitlement to a statement in writing of the reasons for denial of parole. "In so holding," said the District Court, "the [Rhode Island Supreme Court] balanced the burden of requiring a parole board to give its explanation for its decision against the seriousness of the right to have those reasons revealed. . . . Recognizing that Rhode Island regards due process as a 'flexible concept,' [Ouimette, 367 A.2d] at

-11-

709, accord Matthews v. Eldridge, 424 U.S. 319, 335 (1976), [this] court does not find the balance tips in Wigginton's favor."

From the District Court's judgment dismissing his suit Major Wigginton has appealed.

## II.

We have authority to address the issues tendered by Major Wigginton on this appeal if - but only if - the District Court was correct in ruling that appellant's suit is justiciable. In their brief in this court, appellees invoke "well-settled case law that . . . claims against superior officers by subordinates are not justicible [sic]." However, appellees' invocation of "well-settled case law" mandating a finding of non-justiciability appears to be directed only at appellant's second count, and not at the first count, notwithstanding that in the District Court the non-justiciability aspect of General Centracchio's motion to dismiss was addressed to Major Wigginton's entire complaint, and was so treated by the Magistrate Judge in recommending to the District Court that Major Wigginton's complaint be dismissed as presenting claims that were non-justiciable. Appellees' brief does not undertake to explain why the issue of justiciability has become narrower in focus between the District Court and this court.[8]

---

[8] Possibly, the explanation is traceable to the fact that the District Court, while disposing of the first count adversely to Major Wigginton on the merits, did characterize its rejection of both prongs of the

If appellees, in their brief on appeal, had made no mention of justiciability, we might have regarded that issue as not before us. That was the course taken by this court in Charles v. Rice, 28 F.3d 1312, 1316 n.2 (1st Cir. 1994):  we there pointed out that certain issues with respect to which "[t]he district court issued interlocutory

second count as stemming from the conclusion that "[t]hese claims are not justiciable."

As pointed out in footnote 2, supra, the second count, in addition to claiming a lack of due process in the failure of the Selective Retention Board and General Centracchio to recite the reasons underlying Major Wigginton's non-retention, alleged a failure to follow "the criteria set forth in [NGR 635-102]."  The District Court held, in reliance on this court's decision in Navas v. González Vales, 752 F.2d 765, 769-70 (1st Cir. 1985), that, because Major Wigginton had not sought review by the Army Board for the Correction of Military Records of the challenged selective retention procedures, his claim of non-compliance with NGR 635-102 "was nonreviewable as a matter of administrative law."  When translated into this court's language in Navas, the District Court's holding may be taken as signifying that Major Wigginton's "regulatory claim [was] a nonjusticiable military matter as he failed to exhaust his intraservice administrative remedies." 752 F.2d at 771.  (Given our ruling in Navas, it is unsurprising that appellant has not pressed the NGR 635-102 issue on this appeal).

As noted in the text, supra, the District Court's analysis of Major Wigginton's claim of due process entitlement to be told the reasons for non-retention gave some attention to the Rhode Island Supreme Court's opinion in Ouimette, supra and it also mentioned the United States Supreme Court's opinion in Mathews v. Eldridge, supra.  That aspect of the analysis could be read as rejecting Major Wigginton's due process claim as being unpersuasive as a matter of constitutional law. However, a later portion of the analysis culminated in emphasizing "the tremendous deference owed to military decision making."  In view of this latter observation, it seems fair to conclude that the District Court, in stating that "[t]hese [second count] claims are not justiciable," did indeed mean that no part of the second count was litigable.

-13-

orders . . . . have not been briefed by the parties on appeal, and we do not address them in this case"; among those unaddressed issues was a district court ruling "that plaintiff's case was justiciable." But since, in the case at bar, justiciability has been preserved as an issue, we are obligated to address it. Moreover, we are persuaded that we should address the issue as it relates to both counts of Major Wigginton's complaint. Since justiciability is an issue which, as presented to the District Court, posed a question as to the authority of that court to proceed with any aspect of Major Wigginton's case, we do not think that appellees' decision to present the issue to this court in truncated form  -  directed at the second count of the complaint but, as we read appellees' brief, not the first count - should operate to confine our inquiry. We are reinforced in this conclusion by the fact that we have not identified any readily arguable doctrinal basis for supposing that appellant's second count may be less - or more - justiciable than his first count. Accordingly, we turn to a consideration of the comprehensive submission advanced by General Centracchio in his motion to dismiss in the District Court: "internal military personnel decisions concerning a member's fitness for duty have long been held to be non-reviewable by civilian courts."

The District Court, in its opinion granting summary judgment, recapitulated its prior ruling in which it had reviewed the recommendation of the Magistrate Judge:

-14-

that this case should be dismissed as a nonjusticiable controversy.  See Report and Recommendation at 10 (February 5, 1997) (citing United States v. Stanley, 483 U.S. 669, 683-84 (1987) and Chappell v. Wallace, 462 U.S. 296, 304 (1983)).  By order dated March 31, 1998, this court declined to accept this recommendation in toto, finding that only claims for damages are categorically barred by the doctrine of intramilitary immunity and that injunctive remedies may be available to state guardsmen.  Compare Wright v. Park, 5 F.3d 586, 589-90 (1st Cir. 1993) (holding claims for damages on account of injuries incident to military service are barred) with Charles v. Rice, 28 F.3d 1312, 1321 (1st Cir. 1994) (affirming exercise of federal question jurisdiction over national guardsman's claim for reinstatement). Accordingly, the court ruled that this matter was justiciable.

The District Court correctly parsed our decision in Wright v. Park.  That decision built upon the Supreme Court's 1983 decision in Chappell v. Wallace, supra, and the Court's 1987 decision in United States v. Stanley, supra.  In Chappell, the Supreme Court held that, "[t]aken together, the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute special factors which dictate that it would be inappropriate to provide enlisted military personnel with a Bivens-type remedy against their superior officers."  462 U.S. at 304.  (We explained, in Wright v.

-15-

Park, that "Bivens is the case establishing, as a general proposition, that victims of a constitutional violation perpetrated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits." 5 F.3d at 589 n.4). Stanley substantially widened Chappell. Stanley - as we noted in Wright v. Park - "concluded that the Chappell approach should apply to all activities performed 'incident to service' rather than merely to activities performed within the officer/subordinate sphere. Stanley, 483 U.S. at 680-81." 5 F.3d at 590.[9] Our recognition that, pursuant to Stanley, "no Bivens remedy is available for injuries that 'arise out of or are in the course of activity incident to service,'" 483 U.S. at 146, led us to state in Wright v. Park that "we now join several of our sister circuits in accepting this bright-line rule as the definitive statement on the justiciability of civil rights claims in the military context, including the National Guard." 5 F.3d at 590. We then went on to point out that "Wright's suit" - the suit at issue in Wright v. Park - "invoked the Civil Rights Act rather than following the Bivens route. But, absent a specific statutory provision to the contrary, there is no principled basis for according state actors sued

---

[9] As we observed in Wright v. Park, 5 F.3d at 590, the Stanley Court found, see 483 U.S. at 684, that its broadening of Chappell was required in order to maintain doctrinal symmetry with Feres v. United States, 340 U.S. 135 (1950), which foreclosed damage actions against the United States "under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." Id. at 146.

-16-

under 42 U.S.C. §1983 a different degree of immunity than would be accorded federal actors sued for an identical abridgement of rights under Bivens." Wright v. Park, 5 F.3d at 591. Thus, Wright v. Park precludes § 1983 damage actions that "arise out of or are in the course of activity incident to service," including National Guard service. Accordingly, the District Court in the case at bar was correct in its understanding that all intramilitary damage actions are foreclosed by Wright v. Park.

Was the District Court also correct in concluding that "only claims for damages are categorically barred" (emphasis added)? The District Court gleaned this from Charles v. Rice. That case, as the District Court pointed out, was an instance of "exercise of federal question jurisdiction over [a] national guardsman's claim for reinstatement." However, Charles v. Rice is not binding authority for the propriety of that exercise of federal question jurisdiction. As we have already had occasion to point out, in Charles v. Rice the issue of the justiciability of the reinstatement suit brought by the plaintiff national guardsman was addressed by the district court in an interlocutory ruling but was not preserved as an issue on appeal, with the result that this court expressly refrained from passing on the issue. 28 F.3d at 1316 n.2. We are satisfied, nonetheless, that in ruling - contrary to the Magistrate Judge's assessment - that Major Wigginton's suit was justiciable, the District Court was correct in

-17-

concluding that <u>Wright</u> v. <u>Park</u> is not a bar to a guardsman's reinstatement suit, whether brought against federal actors or, as in the case at bar, against state actors pursuant to § 1983. This is so for two reasons:

The first reason is that, as the foregoing reprise of <u>Wright</u> v. <u>Park</u> establishes, our opinion in that case was solely concerned with intramilitary suits for damages, whether brought against federal actors or, under § 1983, against state actors.

The second, and controlling, reason is that, taken together, <u>Chappell</u> and <u>Stanley</u> – the Supreme Court decisions <u>Wright</u> v. <u>Park</u> built upon – make it clear that intramilitary suits alleging constitutional violations but not seeking damages are justiciable.

In <u>Chappell</u>, the unanimous Court, in an opinion by Chief Justice Burger, held that a federal district court could not entertain a <u>Bivens</u>-type damage action in which Navy enlisted personnel complained of racial discrimination at the hands of the officers in command of the naval vessel on which the plaintiffs served.  In the concluding section of the opinion, Chief Justice Burger wrote:

> Chief Justice Warren had occasion to note that "our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 188 (1962).  This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for

-18-

constitutional wrongs suffered in the course of military service. See, e.g., Brown v. Glines, 444 U.S. 348 (1980); Parker v. Levy, 417 U.S. 733 (1974); Frontiero v. Richardson, 411 U.S. 677 (1973). But the special relationships that define military life have "supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have." Warren, supra, at 187.

We hold that enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations.

462 U.S. at 304-05.

Four years later, in Stanley, the Court addressed the question whether a plaintiff could bring a Bivens-type damage action, years after having been discharged from the Army, against Army personnel not all of whom had been his military superiors; the gravamen of plaintiff's complaint was that, while in service, he had volunteered to participate in what was represented as being a test of protective military equipment but was in fact a test of the effects of LSD, and that as part of the test he had been given doses of what - unbeknownst to him until years after his discharge - was LSD, with deleterious consequences. The Court of Appeals for the Eleventh Circuit, in distinguishing Chappell and ruling that Stanley's suit was viable, Stanley v. United States, 786 F.2d 1490, 1495 (11th Cir. 1986), had quoted Chief Justice Burger's statement in Chappell that "[t]his Court

-19-

has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." Chappell, 462 U.S. at 304. But the Supreme Court in Stanley, in reversing the Eleventh Circuit, ruled that Chief Justice Burger's statement was inapposite to Bivens-type actions such as the one brought by Stanley. "As the citations immediately following that statement suggest, it referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages." 483 U.S. at 683. Justice Brennan, joined by Justice Marshall, filed an extended opinion, concurring in part and dissenting in part; but that opinion clearly recognized that the Court's opinion left undisturbed a military plaintiff's entitlement to pursue an equitable action to bring constitutional violations to an end. Justice Brennan's expressed concern was that, for one in Stanley's circumstances, equitable relief would be unavailing. "Of course experimentation with unconsenting soldiers, like any constitutional violation, may be enjoined if and when discovered. An injunction, however, comes too late for those already injured; for these victims, 'it is damages or nothing.' Bivens, 403 U.S. at 410 (Harlan, J., concurring)." 483 U.S. at 690.[10]

---

[10] Justice Stevens joined a portion of Justice Brennan's opinion, but not the portion from which the quotation is taken.

In short, the lesson implicit in <u>Wright</u> v. <u>Park</u> is express in <u>Stanley</u>: Major Wigginton's suit alleging federal constitutional violations and seeking reinstatement in Rhode Island's national guard is cognizable in a federal district court.

We turn, now, to a consideration of the merits of appellant's claims.

## III.

Appellant, as we have previously explained, makes two claims. The first claim is that the joint action of the Selective Retention Board and General Centracchio in terminating his status as a RIANG officer has deprived him, without due process, of a property right, conferred by R.I. Gen. Laws § 30-3-13, to continue to "hold [his] position" as an officer of the Rhode Island guard "until [he] shall have reached the age of sixty (60) years." The second claim is that the non-disclosure to Major Wigginton of the reasons for the Selective Retention Board's recommendation of non-retention - a recommendation which General Centracchio promptly accepted and acted upon - was, from a due process perspective, a constitutionally fatal flaw in the non-retention process.

We will first address appellant's narrowly focused second claim.[11]

_____

[11] In conformity with our ruling that appellant's suit is justiciable because it is a suit in equity rather than a damage action, we assume, <u>arguendo</u>, that if (1) we determine that appellant is correct as a

## A.

As noted earlier in this opinion, appellant's second claim - that he had a due process right to be told the reasons for his non-retention - invokes the Rhode Island Supreme Court's determination in Ouimette, supra, that Rhode Island's parole board must, as a matter of due process, state its reasons when it denies parole. See also Pine v. Clark, 636 A.2d 1319, 1324 (R.I. 1994); State v. Tillinghast, 609 A.2d 217, 218 (R.I. 1992). Ouimette, decided in 1976, anticipated the United States Supreme Court's pronouncement three years later in Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 16 (1979), that "[t]he Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances." Cf. id. at 20-21 (Powell, J., concurring in part and dissenting in part); id. at 38-41 (Marshall, J., joined by Brennan and Stevens, JJ., dissenting in part). See generally 59 Am. Jur. 2d Pardon and Parole § 90 (1987) ("Right to Statement of Reasons for Denial of Parole" (collecting cases)).

---

matter of legal theory with respect to at least one of his alternative constitutional claims, and (2) appellant is then found by the District Court to have established the predicate facts supporting such claim, the District Court would conclude that appellant would be entitled to some form of equitable relief. Whether such hypothesized relief might properly encompass any of the several particularized types of relief sought in appellant's complaint need not be considered at this stage of this litigation.

In his brief on appeal, appellant finds it "ironic" that appellees should take "the position that a convicted felon is entitled to greater due process protection from the parole board than a decorated veteran is from the Rhode Island National Guard." We think, however, that appellant's submission, while perhaps having some rhetorical appeal, does not adequately assess the relative interests at stake of, on the one hand, a person who seeks continuity in employment and, on the other hand, one who seeks release from confinement. By conflating, rather than distinguishing between, these two scenarios, appellant's analysis appears to overlook the fundamental precept that "[t]he applicability of the guarantee of procedural due process depends in the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amendment." Arnett v. Kennedy, 416 U.S. 134, 164 (1974) (Powell, J., concurring in part and concurring in the result in part).

Reasons for denying parole are required to be stated because denial of parole is denial of the most basic "'liberty' interest." As Justice Powell observed in Greenholtz, 442 U.S. at 18, "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."

Appellant's interest is of a different sort. On the verge of completing twenty years of military service - the great bulk of it

as a commissioned RIANG officer - Major Wigginton wished to be one of the twenty-year guard officers selected to continue in service (with, indeed, some possibility of further promotion) pursuant to a program under which - since there are "comparatively few higher level command and staff positions"[12] - only a portion of the twenty-year officers can be selected for retention. Manifestly, what was at stake for Major Wigginton was not a "'liberty' interest." In order to qualify for procedural due process protection, Major Wigginton's hope for retention would, therefore, have to be a "'property' interest." But in the absence of an employment contract for a stated time period, or some analogous hiring engagement contemplating a form of job tenure,[13] Major Wigginton had no cognizable property interest in continued employment in RIANG - unless R.I. Gen. Laws § 30-3-13, the statute which underpins appellant's first count, applies to appellant and vested in appellant

---

[12]   See supra note 1 and accompanying text.

[13]   Academic tenure is, of course, a widespread phenomenon, and abridgement of tenured employment not infrequently gives rise to litigation. See, e.g., Keyishian v. Board of Regents, 385 U.S. 589, 592 (1967); Keefe v. Geanakos, 418 F.2d 359, 363 (1st Cir. 1969) (speaking for this court, then-Chief Judge Aldrich observed: "Academic freedom is not preserved by compulsory retirement, even at full pay."). Tenure for a period of years is a standard concomitant of elective office, see Powell v. McCormack, 395 U.S. 486 (1969); Bond v. Floyd, 385 U.S. 116 (1966), and it is also a usual concomitant of those appointive offices that are intended not to be subject to direction by the executive branch. See Humphrey's Executor v. United States, 295 U.S. 602 (1935); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 167-68 ("It is, then, the opinion of the Court . . . that the appointment conferred on him a legal right to the office for the space of five years.").

a property right to hold his RIANG commission until age sixty. In short, whether appellant has a viable due process claim under the second count of his complaint depends, in the first instance, on the answer to the questions of Rhode Island law with respect to the proper construction of R.I. Gen. Laws § 30-3-13 that are central to appellant's claim under the first count of his complaint - the questions to which we now turn.[14]

**B.**

It is Major Wigginton's basic submission - key to the first count of his complaint, and for the reasons we have just discussed, to the second count as well - that R.I. Gen. Laws § 30-3-13 gave him a property right, of which he could not be deprived without due process, to retain his RIANG commission until age sixty. Such a constitutionally protected property right to retain a public position for a stated term arises when state law has conferred upon a public position elements of continuity sufficient to support the conclusion

---

[14] In saying that "whether appellant has a viable due process claim under the second count" depends on a determination of the proper construction of R.I. Gen. Laws § 30-3-13, we do not mean to suggest that if appellant's construction of the statute is correct, he necessarily will prevail on his second count claim. To prevail, appellant would have to establish that (1) his state law entitlement is strong enough to constitute a federally protected right, see text infra at note 15, and (2) by not being informed of the reasons for non-retention he was denied due process. Whether appellant's due process argument has merit need not be addressed unless appellant's contention that R.I. Gen. Laws § 30-3-13 conferred upon him a federally protected right is sustained.

that, as a matter of federal law, the person asserting the due process

claim has "an enforceable expectation of continued public employment."

Bishop v. Wood, 426 U.S. 341, 345 (1976).[15] In order to address Major

Wigginton's contention that the statute establishes such a property

right, it may be helpful to set forth once again the full text of the

statute:

> All commissioned officers of the staff corps and departments, hereafter appointed, shall have had previous military experience, except chaplains, officers of the judge advocate general's corps, and medical corps officers. They shall hold their positions until they shall have reached the age of sixty (60) years, unless retired prior to that time by reason of resignation or disability, or for cause to be determined by an efficiency board or a court-martial legally convened for that purpose. Vacancies among these officers shall be filled by appointment from the commissioned officers of the national guard or from such other civilians as may be specifically qualified for duty therein.

---

[15] Cf. cases cited supra note 13. "The pretermination process due a government employee is a matter of federal law, see Rivera-Flores v. Puerto Rico Tel. Co., 64 F.3d 742, (1st Cir. 1995), whereas the preliminary question whether a government employee possessed a protectable 'property right,' or a legitimate expectation of continued employment, is controlled by the employment contract or state law. See id." Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 17 (1st Cir. 1996); accord Fireside Nissan v. Fanning, 30 F.3d 206, 219 (1st Cir. 1994). While the "preliminary question whether" an asserted right is a "protectable 'property right'" is "controlled by . . . state law" (which defines the ingredients and scope of the asserted right), whether the asserted right as "controlled by . . . state law" constitutes a "'property right'" of constitutional dimension is a federal question. See E.B. v. Verniero, 119 F.3d 1077, 1106 n.27 (3d Cir. 1997).

It seems apparent that the quoted statutory language contemplates some form of continuity in office until age sixty for those commissioned RIANG officers who are "officers of the staff corps and departments." Appellant - an officer initially commissioned as a Military Police Officer, later assigned as a Public Affairs Officer, and ultimately asked to serve as an Education Officer - contends that he was an officer of the "staff corps and departments." Appellees contend that he was not. On cross-motions for summary judgment, the District Court denied summary judgment in favor of appellant and granted summary judgment in favor of appellees.

We will now consider the grounds for the summary judgment rulings.

**i.**

With a view to elucidating the phrase "staff corps and departments" - a phrase that appears to have had its genesis in Rhode Island law in 1956, when a statutory code governing RIANG was enacted[16]

---

[16] The phrase "staff corps and departments" appears in two other sections of the statutory code governing RIANG. (For the reader's convenience the phrase is printed in bold type):

> The national guard shall consist of such number of federally recognized general officers, officers, warrant officers, and enlisted persons, duly commissioned, warranted, or enlisted therein, including officers and enlisted persons of the **staff corps and departments,** and organized as to branch or arm of service into such federally recognized units, organizations, corps, departments, or otherwise as shall be authorized by the laws of the United States and the regulations issued thereunder.

R.I. Gen. Laws § 30-3-1.

Persons hereafter commissioned as officers of the national guard shall be selected from the following classes:

(1) Officers or enlisted persons of the national guard;

(2) Officers, active or retired, reserve officers, and former officers of the United States army, air force, navy, marine corps, or coast guard, enlisted men and former enlisted persons of the United States army, air force, navy, marine corps, or coast guard who have received an honorable discharge therefrom;

(3) Graduates of any of the United States military and naval academies;

(4) Graduates of schools, colleges, universities, and officers' training camps, where they have received military instruction under the supervision of an officer of the armed forces on active duty who certified their fitness for appointment as commissioned officers;

(5) For the technical branches or **staff corps and departments,** such other civilians as may be specially qualified for duty therein; and

(6) Or otherwise, as the above classes shall be changed or altered by the laws of the United States and the regulations issued thereunder.

R.I. Gen. Laws § 30-3-11.

Similar, but not identical, wording is to be found in the first subsection (here, in bold type) of a statute dealing with the governor's authority to organize, and reorganize, units of the Rhode Island militia:

(a) The governor may organize, alter, increase, divide, annex, consolidate, reorganize, disband, or decrease any unit, organization, **staff corps, and department** whenever in his or her judgment the efficiency of the state militia will be thereby increased or to make the state conform to any table of organization or system of training prescribed by

-28-

- the parties summoned experts:

Brigadier General (Retired) Thomas M. Frazer, former Assistant Adjutant General for Rhode Island and former Deputy Commanding General of RIANG, furnished an affidavit on Major Wigginton's behalf. General Frazer stated that "[i]n my opinion the HQ STARC position of Education Officer is a Staff position." With respect to the meaning of R.I. Gen. Laws § 30-3-13, General Frazer said:

> This document and booklet called the Military Code of Rhode Island is an archaic writing and woefully outdated. However it is still utilized in current day fashion within the National Guard. I have no thought or idea what the writer was trying to convey to the reader and that thought can be argued into the future. It is my thought and opinion that the term "All commissioned officers of the staff corps and departments" was

---

the laws of the United States or the rules or regulations prescribed thereunder for the organization and training of the national guard.

(b) For that purpose, the number of commissioned officers, warrant officers and enlisted men in any unit, organization, staff corps, and department may be increased or diminished and the grades of these commissioned officers, warrant officers, and enlisted men may be altered to the extent necessary to conform thereto.

(c) No organization of the national guard shall be disbanded nor its minimum strength reduced except in conformity with the laws of the United States.

R.I. Gen. Laws § 30-2-9.

and is referring to the various Staff Officers of the National Guard.

General Centracchio's expert was Colonel Rick Baccus, who gave extensive deposition testimony. At the time of his deposition, Colonel Baccus was a supervisory logistics management specialist in RIANG; prior to that assignment he had served as RIANG's personnel director. When asked "what is your definition of the term commissioned officers of the states [sic] corps and departments in Rhode Island General Law 30-3-13?," Colonel Baccus replied:

> A. Since I wasn't involved in writing the law, it would be difficult for me to give you a specific definition, I can only surmise what I think the definition is, and, again, it's referring to some kind of specialty, a special staff position and that's where I only drew the analogy.
>
> Q. But you really don't know, do you?
>
> A. No, sir, because I was not involved with the law.

A subsequent colloquy was to the same effect:

> Q. We have focused a lot on the meaning of the words staff corps, there's also the phrase in there Rhode Island General Law?
>
> A. And departments.
>
> Q. Do you attach any meaning to that phrase?
>
> A. No, not at all. Again, sir, I do not know what the law, what the, you know, the authors of the law or what they were basing the previous law

under.  They may have carried that forward from previous law.

When asked about the meaning of "staff corps and departments" in R.I. Gen. Laws § 30-3-1 (another provision of the statutory code governing RIANG in which the phrase appears)[17] Colonel Baccus responded:

> To be honest, sir, because I was not involved with writing law, I'm not sure, there is no equivalent to today's terminology.

After noting that neither General Frazer nor Colonel Baccus purported to be able to offer a coherent construction of "staff corps and departments," the District Court ruled as follows:

> Of course, in this case, it is incumbent on Major Wigginton to establish that he was a member of the "staff corps and departments."  Even he cannot say with any conviction that he held such commission.  In fact, although Major Wigginton at one time "believed" he was a member of the staff corps, he now admits that he was "never an officer of a corps identified as staff corps officer."  On this basis Major Wigginton's substantive due process claim must fail.

Here we part company with the District Court.  On cross-motions for summary judgment, a plaintiff loses if he cannot produce evidence tending to establish a fact that, under the governing law, the plaintiff is required to prove in order to make out his cause of action.  But that was not the situation at the point that the District Court granted summary judgment against appellant and in favor of appellees. When the District Court granted summary judgment, no

---

[17]  For the text of § 30-3-1, see <u>supra</u> note 16.

-31-

determination had been arrived at as to what the governing law was. That is to say, neither the meaning of the phrase "staff corps and departments" as used in R.I. Gen. Laws § 30-13-3, nor the extent of the rights created by that statute if applicable, had been judicially resolved. And under those circumstances, there was no way to tell whether the evidence adduced by Major Wigginton would, if credited by a fact-finder, suffice as a matter of Rhode Island law to present the federal constitutional question whether state law rights had been abridged without due process.[18] Accordingly, it was error to grant summary judgment on the first count in favor of General Centracchio and the State of Rhode Island. And it would, a fortiori, have been error to grant summary judgment in favor of Major Wigginton. To prevail on his motion for summary judgment, it would have been necessary for Major Wigginton to have established (1) that, as a matter of Rhode Island law, at the time of his discharge from RIANG, he (a) came within the embrace of the phrase "staff corps and departments," as used in R.I. Gen. Laws § 30-3-13, and (b) was, therefore, entitled (in the absence

---

[18] The District Court found it significant that, "although Major Wigginton at one time 'believed' he was a member of the staff corps, he now admits that he was 'never an officer of a corps identified as staff corps officer.'" But neither the fact that Major Wigginton "at one time 'believed' he was a member of the staff corps" nor the fact that he subsequently acknowledged "that he was 'never an officer of a corps identified as staff corps'" could be a datum of any ascertainable legal significance prior to a time at which the term "staff corps," as used in the statutory phrase "staff corps and departments," would acquire, through judicial construction, some concrete legal meaning. Such a time has not yet arrived.

of resignation, disability, or dismissal for cause) to continue as a RIANG officer until age sixty;[19] and (2) that, as a matter of federal law, (a) his state law entitlement to retain his RIANG position until age sixty constituted "an enforceable expectation of continued public employment," Bishop v. Wood, supra, 426 U.S. at 345, and (b) he had been deprived of that constitutionally protected state law entitlement without due process of law.

Prior to a construction by the District Court of R.I. Gen. Laws § 30-13-3, neither of the cross-motions for summary judgment was ripe for disposition.

## ii.

As we have just observed, the District Court did not arrive at a dispositive construction of R.I. Gen. Laws § 30-3-13. We can do no better.

The general thrust of the first two sentences of the statute is apparent. Those persons who are "commissioned officers of the staff corps and departments . . . shall hold their positions until they have reached the age of sixty (60) years, unless retired prior to that time by reason of resignation or disability, or for cause to be determined by an efficiency board or a court martial." Major Wigginton - a

---

[19] Such entitlement would appear substantial enough to support what the Supreme Court has characterized as "an enforceable expectation of continued public employment." Bishop v. Wood, supra, 462 U.S. at 345. See supra note 15.

commissioned officer of RIANG who had not reached age sixty, and who had not been retired by reason of resignation or disability, or for cause - would appear (absent any other contingencies attached to Major Wigginton's continued employment by R.I. law) to be within the protective embrace of the statute if he was an officer of the "staff corps and departments." But what that latter phrase means remains unclear. The first sentence of the statute - "All commissioned officers of the staff corps and departments, hereafter appointed, shall have had previous military experience, except chaplains, officers of the judge advocate general's corps, and medical corps officers." - makes it plain that the phrase "staff corps and departments" connotes a cohort inclusive of, but broader than, "chaplains, officers of the judge advocate general's corps, and medical officers." How much broader? Broad enough to include Major Wigginton, an officer originally commissioned in the Military Police, later assigned as a Public Affairs Officer, and ultimately acting as an Education Officer? We derive no useful textual guidance from the two other provisions of the statutory code governing RIANG that employ the phrase "staff corps and departments."[20] Appellant and appellees, in their submissions to

---

[20]  See supra note 16.

It may be noted that the laws of Massachusetts governing the Massachusetts guard provide that an officer of the "state staff" is entitled to "hold his position until he reaches the age of sixty-five years unless separated prior to that time by resignation, disability, or for cause by a court-martial legally convened for that purpose."

this court, have been unable to adduce any useful legislative history of R.I. Gen. Laws § 30-3-13 and we have found none. Further, the parties have not cited any pertinent decisions construing R.I. Gen. Laws § 30-3-13; and our research confirms that no court (whether a Rhode Island court, a federal court, or a court of another state) has, in a reported opinion, construed "staff corps and departments" as utilized in R.I. Gen. Laws § 30-3-13 (or, indeed, as utilized in either of the two other provisions of the statutory code governing RIANG that employ the phrase).

Thus, what we have before us is a Rhode Island statute which is a tabula rasa. Moreover, the state military code of which the statute is a part is a very special kind of state legislative enactment, for the code governs the Rhode Island aspects of a joint state-federal enterprise of great importance - the Rhode Island Army National Guard. Under these circumstances, in order to achieve a responsible resolution of the issues presented by this pending appeal, it plainly would be better to have a current and authoritative construction of R.I. Gen. Laws § 30-3-13 by the Rhode Island judiciary than to have a conjectured prophecy by this court of what Rhode Island's courts might be expected to rule at some future time. Happily, the Supreme Court of Rhode Island has in place a procedure

Mass. Gen. Laws, ch. 33, § 15(a). However, § 15 goes on to identify, by specific military designation, the several officers who compose the "state staff."

-35-

pursuant to which it "may answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court if there are involved in any proceeding before it questions of law which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court." Rhode Island Supreme Court Rules, Art. I, Rule 6, § 1. The quoted rule precisely describes the circumstance in which this court finds itself. In the pending appeal, what may prove determinative of the cause are answers by the Supreme Court of Rhode Island to two questions of Rhode Island law framed by the facts previously set forth in this opinion:

> 1. At the time Major Wigginton was discharged from RIANG, was he an officer of the "staff corps and departments" within the meaning of R.I. Gen. Laws § 30-3-13?
>
> 2. If the answer to Question 1 is "Yes," does that signify that, pursuant to R.I. Gen. Laws § 30-3-13, Major Wigginton was (in the absence of resignation, disability, or dismissal for cause) therefore entitled to continue as a RIANG officer until age sixty, or would Rhode Island's statutory and/or decisional law attach any other contingency to Major Wigginton's continued status as a RIANG officer?

Accordingly, by an appropriate Certification Order accompanying this opinion, we are certifying these questions of Rhode Island law to the Supreme Court of Rhode Island.