HAMILTON, Circuit Judge,
joined by ROVNER and WILLIAMS, Circuit Judges, dissenting.
All members of this court agree that plaintiffs Vance and Ertel have alleged that members of the United States military tortured them in violation of the United States Constitution, and that in reviewing a denial of a motion to dismiss under Rule 12(b)(6), we must accept those allegations as true. Our disagreement is about whether plaintiffs have a civil remedy available to them under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allows a victim of a constitutional violation to sue a responsible federal officer or employee for damages.
If a victim of torture by the Syrian military can find his torturer in the United States, U.S. law provides a civil remedy against the torturer. Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note. If the victim is killed, the same U.S. law provides his survivors a civil remedy. The same could be said for victims of torture by any other government in the world— any other, that is, except one. Under the majority’s decision, civilian U.S. citizens who are tortured or worse by our own military have no such remedy. That disparity attributes to our government and to our legal system a degree of hypocrisy that is breathtaking.
The majority’s result is not required or justified by Supreme Court precedent, and it fails to carry out the judiciary’s responsibility under Supreme Court precedents to protect individual rights under the Constitution, including a right so basic as not to be tortured by our government. Although the majority opinion is written in terms of whether to “create” a cause of action under Bivens, the majority in effect creates a new absolute immunity from Bivens liability for all members of the U.S. military. This new absolute immunity applies not only to former Secretary Rumsfeld but to all members of the military, including those who were literally hands-on in torturing these plaintiffs. It applies to military mistreatment of civilians not only in Iraq but also in Illinois, Wisconsin, and Indiana.
The majority’s immunity is even more sweeping than the government and former Secretary Rumsfeld sought. To find this immunity, the majority relies on Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and United States v. *212 Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), which each held that soldiers may not sue under Bivens for injuries “incident to service.” The majority decision takes Chappell and Stanley far beyond them holdings and rationales, granting the entire U.S. military an exemption from all Bivens liability, even to civilians. The majority decision is also difficult to reconcile with Mitchell v. Forsyth, 472 U.S. 511, 520-24, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which held that national security considerations did not entitle another former cabinet officer to absolute immunity in a Bivens action.
For these reasons, and because this appeal raises such fundamental issues about the relationship between the American people and our government, I respectfully dissent. The panel opinion explained in detail why the civil immunity sought by defendants is not justified for a claim for torture or worse in a U.S. military prison in Iraq. Vance v. Rumsfeld, 653 F.3d 591 (7th Cir.2011). I will not repeat here all the details from the panel opinion. Instead, I address the majority’s new grant of an even broader immunity and explain the core Supreme Court precedents, the relevant legislation, and the reasoning that should allow plaintiffs to pursue them claims for torture. Part I first reviews the familiar elements of plaintiffs’ Bivens claims and then explains the errors in the majority’s reliance on Chappell and Stanley, as well as the import of Mitchell and other cases rejecting absolute immunity in similar Bivens cases. Part I then turns to the legislation indicating that Congress has assumed that Bivens applies to cases like this one, as well as the anomalous consequences of the majority’s decision. Finally, the opinion addresses briefly in Part II the sufficiency of the allegations against Mr. Rumsfeld personally and in Part III the question of qualified immunity.[1]
I. Civilian Remedies Under Bivens for Military Wrongdoing
Before this en banc decision and the Fourth Circuit’s recent decision in Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir.2012), there should have been no doubt that a civilian U.S. citizen prisoner tortured by a federal official, even a military officer, could sue for damages under Bivens. See Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (allowing Bivens claim against prison officials who were deliberately indifferent to prisoner’s serious medical needs); Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (holding that military police officer was entitled to qualified immunity on civilian’s Bivens claim for excessive force, without suggesting that defendant’s status as military officer alone would bar Bivens action). The majority rejects this conclusion, at least for torture by military personnel, by asking the wrong question. Plaintiffs are not asking this court to create a cause of action. It already exists. It is the defendants who have sought and have now been given a new, extraordinary, and anomalous exception to Bivens.
A. The Familiar Elements of Plaintiffs’ Bivens Claims
All the key elements of plaintiffs’ Bivens claims are well established under Supreme Court precedent: (1) prisoners may sue for abuse by federal officials; (2) civilians may sue military personnel; (3) the Constitution governs the relationship between U.S. citizens and their government over *213 seas; and (4) claims against current and former cabinet officials are permitted. Permitting a Bivens claim for torture by military personnel should not be controversial, at least barring interference with combat or other highly sensitive activity, which is not involved here.
First, of course, Bivens is available to prisoners who have been abused or mistreated by their federal jailors, and that reasoning certainly extends to the torture alleged here. In Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, the Supreme Court reversed dismissal of a complaint in which a deceased prisoner’s representative sued for violation of the Eighth Amendment prohibition on cruel and unusual punishment, in that case through an alleged deliberate denial of needed medical care. Since Carlson, federal courts have routinely considered prisoners’ constitutional claims against federal prison officials. E.g., Bagola v. Kindt, 131 F.3d 632 (7th Cir.1997) (district court properly heard Bivens claim alleging injury as part of prison work program where workers’ compensation program did not provide adequate safeguards to protect prisoner’s Eighth Amendment rights); Del Raine v. Williford, 32 F.3d 1024 (7th Cir.1994) (recognizing prisoner’s Bivens claim alleging that he was forced to live in bitterly cold cell). As Judge Wood points out, the torture alleged here lies at the extreme end of abuse that violates the Constitution.
Second, under Bivens civilians may sue military personnel who violate their constitutional rights. For example, Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, an important but now overruled case on procedures for deciding qualified immunity, was a Bivens claim for excessive force brought by a civilian against a military police officer. Saucier did not hint that the civilian could not sue the military police officer for violations of clearly established constitutional rights. If the majority were correct, though, the Supreme Court in Saucier should have simply rejected the Bivens claim altogether, not explored the nuances of procedures for deciding qualified immunity.
Circuit and district courts have decided many Bivens cases brought by civilians against military personnel. While such claims often fail on the merits or for other reasons, the fact that a civilian has sued a military official is not a basis for denying relief under Bivens. If the majority here were right, though, all such cases should have been dismissed on the new and simple theory that military personnel are altogether immune from Bivens liability. See, e.g., Case v. Milewski 327 F.3d 564 (7th Cir.2003) (civilian claim against military officers for Fourth and Fifth Amendment violations); Morgan v. United States, 323 F.3d 776 (9th Cir.2003) (civilian claim against military police for search of vehicle); Roman v. Townsend, 224 F.3d 24 (1st Cir.2000) (civilian claim against military police officer and Secretary of the Army for improper arrest and treatment in detention); Applewhite v. United States Air Force, 995 F.2d 997 (10th Cir.1993) (civilian claim against military investigators for unlawful search and removal from military base); Dunbar Corp. v. Lindsey, 905 F.2d 754, 761 (4th Cir.1990) (civilian claim against military officers for deprivation of property -without due process of law); see also Newton v. Lee, 677 F.3d 1017, 1028 (10th Cir.2012) (civilian claim against state National Guard officers under § 1983 for due process violation); Meister v. Texas Adjutant General’s Dep’t, 233 F.3d 332, 338 (5th Cir.2000) (civilian employee of state National Guard could bring constitutional claims against officers under § 1983); Wright v. Park, 5 F.3d 586 (1st Cir.1993) (whether National Guard technician could bring Bivens claim depended on whether he was deemed civilian or military *214 personnel); Fields v. Blake, 349 F.Supp.2d 910, 921 (E.D.Pa.2004) (summary judgment on the merits of civilian’s claim against military officer for unconstitutional arrest); Willson v. Cagle, 711 F.Supp. 1521, 1526 (N.D.Cal.1988) (concluding that “a Bivens action may potentially lie against military officers and civilian employees of the military” for protesters injured when a military munitions train collided with them), aff'd mem., 900 F.2d 263 (9th Cir.1990) (affirming denial of qualified immunity); Barrett v. United States, 622 F.Supp. 574 (S.D.N.Y.1985) (allowing civilian’s Bivens claim to proceed against military officials for their alleged concealment of their roles in the creation and administration of an army chemical warfare experiment), aff'd, 798 F.2d 565 (2d Cir.1986).[2]
Third, when civilian U.S. citizens leave the United States, we take with us the constitutional rights that protect us from our government. In Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Supreme Court held that civilian members of military families could not be tried in courts martial. Justice Black wrote for a plurality of four Justices:
At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government.
Id. at 5-6, 77 S.Ct. 1222 (emphasis added). That general proposition remains vital, as reaffirmed in Boumediene v. Bush, holding that aliens held as combatants at Guantanamo Bay may invoke the writ of habeas corpus to challenge their detention: “Even when the United States acts outside its borders, its powers are not ‘absolute and unlimited’ but are subject ‘to such restrictions as are expressed in the Constitution.’ ” 553 U.S. 723, 765, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), quoting Murphy v. Ramsey, 114 U.S. 15, 44, 5 S.Ct. 747, 29 L.Ed. 47 (1885); see also Munaf v. Geren, 553 U.S. 674, 688, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (holding that civilian U.S. citizens held in U.S. military custody in Iraq could petition for a writ of habeas corpus in federal district court). Cf. United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (holding that non-resident alien could not invoke Fourth Amendment to challenge search by U.S. officials in foreign country).[3]
Fourth, our laws permit suit against public officials for actions taken while serv *215 ing at the highest levels of the United States government. The majority expresses great concern over former Secretary Rumsfeld’s personal finances and how the risk of Bivens liability might affect other senior government officials as they perform their public duties. The policy balances that are always part of Bivens analysis are no doubt delicate. The defendant’s former rank, however, is not a basis for rejecting these plaintiffs’ claims. The Supreme Court has repeatedly permitted Bivens actions against other cabinet members. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (former Attorney General was entitled to qualified immunity, not absolute immunity, from damages suit arising out of national security-related actions); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (senior presidential aides are entitled to qualified immunity, not absolute immunity, from liability when their conduct “does not violate clearly established statutory or constitutional rights of which a reasonable person would have known”); Halperin v. Kissinger, 606 F.2d 1192 (D.C.Cir.1979) (senior executive branch officials, including a former President, were not absolutely immune from suit for damages by citizen alleging an unconstitutional wiretap), aff'd in relevant part, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (Secretary of Agriculture and other executive branch officials ordinarily may be entitled to qualified, not absolute, immunity from constitutional claims).
B. Bivens Cases Involving the Military and National Security
Without coming to grips with the principles and precedents supporting plaintiffs’ claims here, the majority errs by relying on Chappell v. Wallace and United States v. Stanley to exempt any military personnel from civil liability for violating the constitutional rights of civilians. The Supreme Court itself has never adopted or even suggested such a sweeping view.
Chappell was the easier case, in which enlisted sailors sued their direct superior officers under Bivens for race discrimination. In dismissing those claims, the Court was guided by the Feres doctrine under the Federal Tort Claims Act, which bars military personnel from suing for injuries “incident to service.” See Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Relying on Feres, the Chappell Court held unanimously that the sailors could not sue their direct superior officers under Bivens. 462 U.S. at 305, 103 S.Ct. 2362. Nothing in Chappell hinted that its reasoning would apply to civilians whose constitutional rights were violated by military personnel, and it is well established that the Feres doctrine does not apply to claims by civilians. E.g., United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); M.M.H. v. United States, 966 F.2d 285, 288-89 (7th Cir.1992) (Feres doctrine did not apply to veteran’s negligence claim based on Army’s negligence after veteran’s discharge); Rogers v. United States, 902 F.2d 1268, 1273-74 (7th Cir.1990). The reliance on the Feres doctrine is a strong signal that Chappell does not reach claims by civilians and that the majority errs by relying upon it here.
Stanley also provides no basis for barring Bivens claims by civilians. While plaintiff Stanley was serving in the Army, he was exposed to LSD without his consent in secret experiments, resulting in serious harm to him and his family. He sued under Bivens for violation of his constitutional rights. The potential individual defendants would have included not his direct superior officers but other military *216 and civilian personnel. A closely divided Supreme Court held that he could not sue under Bivens because his injuries arose incident to his military service, essentially applying the Ml extent of the Feres “incident to service” standard to Bivens claims by military personnel. 483 U.S. at 684, 107 S.Ct. 3054 (“We hold that no Bivens remedy is available for injuries that ‘arise out of or are in the course of activity incident to service.’ ”), quoting Feres, 340 U.S. at 146, 71 S.Ct. 153. Stanley teaches that the plaintiffs status as military or civilian is decisive in a Bivens case, not that military defendants cannot be sued under Bivens.
The majority’s use of Stanley to bar torture claims by civilians depends on dicta severed from context: “The ‘special factor’ that ‘counsels hesitation’ is not the fact that Congress has chosen to afford some manner of relief in the particular ease, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate.” Ante at 200, quoting 483 U.S. at 683, 107 S.Ct. 3054. That sentence cannot reasonably be read to have extended a blanket exemption to all U.S. military personnel for Bivens liability to civilians. That was not the issue before the Court, and the Court would not have casually embraced such a sweeping rule in dicta. Even if it had, surely someone would have noticed. Until the majority’s decision here, though, no other circuit court has read Chappell and Stanley to produce this extraordinary result.[4]
We should focus instead on the Supreme Court’s more relevant decisions in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In Mitchell, the Court held that former Attorney General Mitchell was not entitled to absolute immunity from Bivens liability for ordering unconstitutional surveillance of the plaintiff even though Mr. Mitchell argued he acted for reasons of national security. 472 U.S. at 520-24, 105 S.Ct. 2806. The Court observed that the national security context counseled in favor of permitting the suit. Because national security tasks are carried out in secret, “it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation,” id. at 522, 105 S.Ct. 2806, and the “danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity,” id. at 523, 105 S.Ct. 2806.
The Mitchell Court anticipated and firmly rejected the majority’s arguments for absolute immunity based on concerns about the chilling effect that the prospect of personal liability might have for even senior government officials. The Court held instead that qualified immunity would strike the correct balance between deter *217 ring clear violations of constitutional rights and giving government officials room for discretionary judgment and reasonable mistakes:
“Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate....” [Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (emphasis added).] This is as true in matters of national security as in other fields of government action. We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.
472 U.S. at 524, 105 S.Ct. 2806. That reasoning applies directly to this case and to the Secretary of Defense and other military personnel in the operation of military prisons.
Scheuer v. Rhodes arose from the fatal shots that National Guardsmen fired at protesting students at Kent State University in 1970. The plaintiffs alleged constitutional violations in a suit under 42 U.S.C. § 1983 against the state’s governor and several officers in the National Guard. The defendants argued they were entitled to absolute immunity when using military force to restore public order. The Supreme Court unanimously rejected that defense and held that the defendants were entitled to only qualified immunity for these claims by civilians. 416 U.S. at 248-49, 94 S.Ct. 1683. Because the defendants were state officials, the suit was under section 1983 rather than Bivens, but for present purposes the key point is that the use of military force against civilians was subject to only qualified immunity, not the absolute immunity that the majority in this case grants to military personnel.[5]
C. Legislation and “Special Factors ”
In addition to reading Chappell and Stanley too broadly, the heart of the majority opinion converts the second step of Bivens analysis — looking at “special factors” that might counsel hesitation before authorizing the claim — into a search for evidence that Congress has expressly authorized Bivens actions against U.S. military personnel. This method of analysis fails to follow the Supreme Court’s instructions for considering new questions about the scope of the Bivens remedy. The first step is to consider “whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.” Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007). The short answer is no. The defendants do not suggest that there is any alternative remedial scheme at all comparable to a potential Bivens remedy in the way that Social Security procedures and remedies in Schweiker or the federal civil service procedures and remedies in Bush provided substitute remedies that foreclosed Bivens remedies. See Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); Bush v. Lucas, 462 *218 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).
Because there is no sufficient alternative, we should proceed to the second step of the Bivens test as described in Bush v. Lucas: “the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.” 462 U.S. at 378, 103 S.Ct. 2404, quoted in Wilkie, 551 U.S. at 550, 127 S.Ct. 2588.
The focus before the panel was on torture claims arising from military custody in the controlled, non-combat environment of military prisons in an overseas war zone. That context requires careful balancing under the second step of the Bivens analysis, and the panel opinion discussed the relevant considerations for rejecting the defense arguments based on the narrower rationale they offered. See Vance, 653 F.3d at 617-26. Because the en banc majority’s approach sweeps so much more broadly than the defendants’ own arguments, I will not repeat the panel’s discussion here. The majority reviews a wide range of statutes and finds in them congressional disfavor for Bivens actions against military personnel generally, based on an inference that Congress would prefer to have compensation for wrongs done by the military come from the Treasury rather than the judgments against individual personnel.
When we look closely at the statutes, however, it should become clear that Congress has legislated on the assumption that U.S. nationals, at least, should have Bivens remedies against U.S. military personnel in most situations.
First, let’s look at legislation on the subject of torture. Torture is a crime under international and U.S. law. U.S. law provides expressly for civil remedies for victims of torture by government officials of other nations in the Torture Victim Protection Act of 1991, Pub.L. 102-256, codified as note to the Alien Tort Statute, 28 U.S.C. § 1350. Section 2(a) of that Act provides a cause of action for damages against a person who, “under actual or apparent authority, or color of law, of any foreign nation,” subjects another person to torture or extrajudicial killing. Section 2(b) requires U.S. courts to decline to hear such claims “if the claimant has not exhausted adequate and available remedies in the place” where the conduct occurred. Under the Act, if an alien has been tortured by her own government, and if that foreign government provides no adequate and available civil remedies, then a U.S. court can hear the case against a defendant found here.
Under the majority holding here, however, the same U.S. courts are closed to U.S. citizens who are victims of torture by U.S. military personnel. The majority thus errs by attributing to Congress an intention to deny U.S. civilians a right that Congress has expressly extended to the rest of the world. A victim of torture by the Syrian military, for example, can sue in a U.S. court, but a U.S. citizen tortured by the U.S. military cannot. That conclusion should be deeply troubling, to put it mildly. We should not attribute that improbable view to Congress without a far more compelling basis than the majority offers.
To illustrate this anomaly further, suppose another country has enacted its own law identical to the U.S. Torture Victim Protection Act. Under the majority’s reasoning, there are no “adequate and available remedies in the place” where the conduct occurred (a U.S. military base). If Mr. Rumsfeld could be found visiting a country with its own TVPA (so he could be served with process), plaintiffs Vance and *219 Ertel could sue him in that country under its TVPA because U.S. law would provide no remedy. Surely the Congress that enacted the Torture Victim Protection Act would rather have such claims against U.S. officials heard in U.S. courts.
In fact, the U.S. government has relied on the availability of Bivens claims in cases of government torture to help show that the U.S. is complying with our obligations under the United Nations Convention Against Torture. A United Nations committee overseeing compliance questioned the fact that the United States had enacted virtually no new legislation to implement the Convention Against Torture. The State Department assured the United Nations that the Bivens remedy is available to victims of torture by U.S. officials. The State Department made no exception for military personnel, who were the principal focus of the U.N. inquiry. See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006) (Question 5), available at http://www.state.gOv/g/ drl/rls/68554.htm (last accessed Oct. 25, 2012); see also Arar v. Ashcroft, 585 F.3d 559, 619 (2d Cir.2009) (en banc) (Parker, J., dissenting) (pointing out this reliance on Bivens).
In addition to the Torture Victim Protection Act, Congress acted in the Detainee Treatment Act of 2005 to grant only limited (good faith) immunity to U.S. personnel, including military personnel, in lawsuits by alien detainees. For those alien plaintiffs, Congress opted to regulate — not prohibit — civil damages claims against military officials accused of torturing aliens suspected of terrorism. Congress created a good-faith defense in civil and criminal cases for officials who believed that their actions were legal and authorized by the U.S. government:
In any civil action or criminal prosecution against an officer, employee, member of the Armed Forces, or other agent of the United States Government [for engaging in practices involving detention and interrogation of alien detainees suspected of terrorism] it shall be a defense that such officer, employee, member of the Armed Forces, or other agent did not know that the practices were unlawful and a person of ordinary sense and understanding would not know the practices were unlawful____Nothing in this section shall be construed to limit or extinguish any defense or protection otherwise available to any person or entity from suit, civil or criminal liability, or damages, or to provide immunity from prosecution for any criminal offense by the proper authorities.
42 U.S.C. § 2000dd-l(a). This express but limited defense against civil claims by alien detainees suspected of terrorism is a strong indication that Congress has not closed the door on judicial remedies that are “otherwise available,” certainly for U.S. citizens, even though it chose not to wrestle with just what those remedies might be.[6]
Congress took the trouble to grant limited immunity in civil actions brought by aliens. Just what potential civil liability did Congress have in mind? Bivens suits are the most obvious candidate.
*220 To avoid this reasoning, the majority-misses the mark by suggesting that Congress might have been worried about suits brought by aliens under the Torture Victim Protection Act, the law of the nation where the torture occurred, or the Alien Tort Statute. Ante at 201-02. First, the Torture Victim Protection Act applies only to torture carried out “under actual or apparent authority, or color of law, of any foreign nation.” The Act does not apply at all to torture under color of U.S. law. Second, if an alien were to sue under the law of the nation where the torture took place, it is not likely that the other nation’s law would take into account a defense created by U.S. law. As for the Alien Tort Statute, such a claim by an alien against a U.S. official would be a fairly exotic creature, especially as compared to the familiar Bivens doctrine.
Young doctors are taught, “When you hear hoofbeats, think horses, not zebras.” The point is that when trying to explain an unknown phenomenon, it’s usually sensible to look first to the familiar and only later to the exotic. That reasoning applies here. When Congress created the limited good-faith immunity from civil claims by aliens in the Detainee Treatment Act, Bivens had been a major part of U.S. law for 40 years. If Congress had wanted to grant absolute immunity against claims by aliens, it would have been easy to draft different language. Congress chose instead to grant qualified immunity in suits by alien detainees, a policy decision that was consistent with the Supreme Court’s reasoning in Mitchell v. Forsyth, 472 U.S. at 523-24, 105 S.Ct. 2806.
The majority reasons that the DTA’s grant of qualified immunity in suits brought by aliens does not imply that similar remedies would be available to U.S. citizens. By that route, the majority reaches another odd result. Under the majority’s reasoning, aliens tortured by the U.S. military in violation of international law have more rights than U.S. citizens: Aliens could sue U.S. military officers for torture (under Bivens, or the Alien Tort Statute, or both). They would still need to overcome the DTA’s qualified immunity, but under the majority’s reading, U.S. citizens cannot bring such a suit at all. That reading of congressional intent is highly improbable. Reading the DTA, it is more reasonable to attribute to Congress the assumption that courts would allow U.S. citizens to pursue relief under Bivens, subject to the familiar qualified immunity defense.
Looking to other legislation, the majority criticizes plaintiffs for not having sought relief under the Military Claims Act, 10 U.S.C. § 2733, or the Foreign Claims Act, 10 U.S.C. § 2734, though the majority wisely concedes at least for the sake of argument that these statutes are not full substitutes for a Bivens remedy. Ante at 201. This criticism is misguided, as implied by the fact that even the defendants did not rely on these statutes at all before the en banc phase of the case. At the most basic level, those laws simply do not apply to claims for constitutional violations. 32 C.F.R. § 536.42. Nor do they apply to intentional torts, including assault, battery, and false imprisonment. 32 C.F.R. § 536.45(h). Plaintiffs would have been wasting everyone’s time by asserting claims under either Act.[7]
*221 D. The Role of Citizenship in Constitutional Remedies
The panel relied on plaintiffs’ status as U.S. citizens to distinguish Arar v. Ashcroft, 585 F.3d 559, and Ali v. Rumsfeld, 649 F.3d 762 (D.C.Cir.2011), where plaintiffs asserting torture claims under Bivens were aliens. The panel issued its decision before Lebron, 670 F.3d 540, and Doe v. Rumsfeld, 683 F.3d 390 (D.C.Cir.2012), went further and dismissed similar Bivens claims by U.S. citizens. The majority describes the panel’s distinction between citizens and aliens as “offensive to our allies” and “offensive to our own principles of equal treatment.” Ante at 203. The prohibitions against torture are matters of international law as well as U.S. law, and those prohibitions reflect basic and universal human rights. That does not mean, however, that citizenship is irrelevant in deciding about remedies for torture. If the U.S. government harms citizens of other nations, they can turn to their home governments to stand up for their rights. That is not true for these U.S. citizens alleging torture by their own government. No other government can stand up for them.
Other federal courts have faced difficult issues when alien enemy combatants have sought protection in civilian U.S. courts. U.S. courts have been reluctant to extend constitutional protections to such parties or to examine too closely the actions of our military in armed conflicts. We do not need to decide those difficult issues in this case, which was brought not by members of al Qaeda or designated enemy combatants, but by U.S. citizens working for military contractors and trying to help the FBI uncover corrupt dealings that were endangering U.S. troops. The enemy combatant cases are difficult, but we should not let those difficulties lead us to turn our backs on legitimate constitutional claims of U.S. citizens.
The Supreme Court has relied on the difference between citizens and aliens in deciding whether to allow access to civilian U.S. courts in similar contexts. We should decide this case in favor of allowing these U.S. citizens to proceed, even if we might be reluctant to extend such rights to enemy combatants or other alien detainees in Iraq or other war zones.
When considering actions our government takes overseas, there is room to distinguish between the government’s duties to its own citizens and duties it may have to other persons. As the Supreme Court concluded in Reid: “When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.” 354 U.S. at 6, 77 S.Ct. 1222 (plurality opinion of Black, J.); see also Kar v. Rumsfeld, 580 F.Supp.2d 80, 83 (D.D.C.2008) (finding that the “Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq”), citing Reid and United States v. Toscanino, 500 F.2d 267, 280 (2d Cir.1974) (“That the Bill of Rights has extraterritorial application to the conduct of federal agents directed at United States citizens is well settled.”).
In fact, the Supreme Court has distinguished between citizens and aliens in deciding whether remedies were available in civilian courts for U.S. military detention overseas. In Johnson v. Eisentrager, 339 U.S. 763, 785, 70 S.Ct. 936, 94 L.Ed. 1255 *222 (1950), the Supreme Court held that enemy aliens (Germans working in Asia to aid Japan after the German surrender in 1945) were not entitled to seek writs of habeas corpus in civilian U.S. courts. Eisentrager repeatedly made clear that its holding was limited to aliens during wartime and did not apply to U.S. citizens. For example: “our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens....” Id. at 769, 70 S.Ct. 936. “With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen’s claims upon his government for protection.” Id.[8]
More recently, the Supreme Court relied on this distinction between aliens and citizens in Munaf v. Geren, 553 U.S. 674, 685-88, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), holding unanimously that U.S. citizens in U.S. military custody in Iraq were entitled to seek habeas corpus relief in U.S. civilian courts. Munaf distinguished Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948), which held that aliens in military custody overseas could not seek habeas relief in civilian courts. To support its use of the difference between citizens and aliens, the Munaf Court cited Eisentrager, Rasul v. Bush, 542 U.S. 466, 486, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (Kennedy, J., concurring in judgment), and the D.C. Circuit’s opinions in Munaf itself. 553 U.S. at 688, 128 S.Ct. 2207. (In fact, the government did not even try to argue in Munaf that U.S. citizens in military custody in Iraq could not have access to civilian U.S. courts. The government instead argued unsuccessfully that the petitioners were in international custody rather than U.S. custody. Id. at 687-88, 128 S.Ct. 2207.)
Distinguishing between citizens and aliens is not beyond controversy, but in these sensitive contexts involving overseas activity, it is sometimes decisive. In this case brought by U.S. citizens, we do not need to decide the different issues posed by plaintiffs who are alien enemy combatants. But if we follow the majority’s route of equal treatment, notwithstanding Munaf, Eisentrager, and Rasul, we should not treat these U.S. citizens as if they were known terrorists and enemy combatants who are subject to torture, “extraordinary rendition,” and indefinite detention. Our law’s treatment of U.S. citizens should not be brought down to the floor that we are now tolerating for the most dangerous foreign terrorists.
II. Personal Responsibility
As explained above, the majority opinion erroneously grants absolute immunity to U.S. military personnel from civilians’ Bivens suits, not only for former Secretary Rumsfeld and other senior officials but *223 also for lower-ranking personnel, including even those who were literally hands-on in torturing the plaintiffs. Under that reasoning, the majority need not reach the issue of personal responsibility for any defendant. Also, since the panel decision, plaintiffs have been able to learn the identities of the personnel directly responsible for torturing them. Because plaintiffs now have the information they would need to amend their complaint to add those individuals as defendants, the issue of former Secretary Rumsfeld’s personal responsibility has less practical significance now than it did in the district court or before our court’s panel. Nevertheless, because the majority also reaches the issue, and because the question must be addressed to affirm the district court’s denial of dismissal, it must be addressed here.
I agree with the majority’s general statements' of the law of personal responsibility under Bivens and 42 U.S.C. § 1983. Responsibility is personal, not vicarious. Where we differ is in the application of those general principles to plaintiffs’ second amended complaint. The majority offers the following examples:
The Director of the FBI allows field agents to carry guns and permits them to use deadly force. Yet if an agent shoots a fleeing suspect in the back, violating the fourth amendment, see Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Director is not liable just because the gun, issued under the Director’s policy, was a cause of the injury. Similarly for a police chief who establishes a K-9 squad, if a dog bites a bystander, or who authorizes search or arrest based on probable cause, if the police then search or arrest without probable cause.
Ante at 204. The majority is correct about those examples, but they miss the target of plaintiffs’ actual allegations. To sharpen the issue, suppose instead that a local police chief or even the FBI director issued a policy that authorized the use of deadly force against any fleeing suspect. The policy itself would be unconstitutional under Tennessee v. Garner, The chief or director who authorized that unconstitutional use of force could certainly be held personally responsible under section 1983 or Bivens to a person shot by an officer following the policy.
The allegations in this complaint are closer to the latter example than to the majority’s examples. The plaintiffs may or may not be able to prove their allegations — it now is unlikely they will ever have the chance to try — but they allege that the use of harsh interrogation techniques amounting to torture was the subject of Mr. Rumsfeld’s personal attention. Cmplt. ¶¶ 217, 244, 252. They allege that he issued policies or orders contrary to governing U.S. law but authorizing the torture they suffered. ¶ 244. That should be enough to withstand a motion to dismiss under Rule 12(b)(6).
In Ashcroft v. Iqbal itself, the Attorney General and the Director of the FBI conceded that they would have been subject to personal liability for actions of their subordinates if they “had actual knowledge of the assertedly discriminatory nature of the classification of suspects being of ‘high interest’ and that they were deliberately indifferent to that discrimination.” 556 U.S. 662, 690-91, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (Souter, J., dissenting). We and other circuits have taken that approach as well. See T.E. v. Grindle, 599 F.3d 583, 590 (7th Cir.2010) (affirming denial of summary judgment for school principal who failed to investigate or take action in response to complaints indicating teacher was sexually abusing students); accord, McCreary v. Parker, 456 Fed.Appx. 790, 793 (11th Cir.2012) (affirming *224 denial of qualified immunity where plaintiff alleged sheriff was deliberately indifferent to known dangers resulting from overcrowding policy in jail); Wagner v. Jones, 664 F.3d 259, 275 (8th Cir.2011) (reversing summary judgment grant of qualified immunity for defendant law school dean where evidence indicated that dean was on notice that faculty’s negative hiring recommendation was based on plaintiffs political beliefs and associations); Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir.2011) (reversing dismissal; superior’s knowledge of abuse of prisoners combined with inaction allowed inference of deliberate indifference at the pleading stage); Dodds v. Richardson, 614 F.3d 1185 (10th Cir.2010) (affirming denial of summary judgment of a claim against county sheriff for adopting policy that would violate detainees’ rights). Iqbal’s different approach to pleading an individual’s discriminatory intent does not address the issue of personal responsibility for an unconstitutional practice or policy asserted here. See Vance, 653 F.3d at 599 n. 5.
The case is before us on an interlocutory appeal from the denial of a motion to dismiss under Rule 12(b)(6). The allegations against Mr. Rumsfeld satisfy the plausibility standard of Iqbal, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). And even if they did not, the plaintiffs should be allowed to amend their pleadings, especially in view of the uncertainty of federal pleading standards after Iqbal and the fact that the district court and panel found their present pleadings sufficient to state plausible claims. See, e.g., Bausch v. Stryker Corp., 630 F.3d 546, 562 (7th Cir.2010); Airborne Beepers & Video, Inc. v. AT & T Mobility LLC, 499 F.3d 663, 666 (7th Cir.2007). Consider two possible amendments, for example. After years of delay, the government finally complied with the district court’s order to identify the individuals who slammed plaintiffs into walls, deprived them of sleep, food, water, and adequate clothing, and who subjected them to extreme cold, though after plaintiffs have been seeking the needed information in the district court for nearly six years, the government still has not provided sufficient information to serve any of those individuals with process. If this stone-walling finally ended, plaintiffs could amend their complaint to name at least some of those individuals. (Whether plaintiffs could invoke equitable tolling or other doctrines to overcome a statute of limitations defense based on a concerted effort to conceal identities of their torturers is a different question, especially in light of plaintiffs’ diligence over nearly six years, and one we should not try to decide now.) Or suppose for purposes of argument that plaintiffs could even produce an order personally signed by Mr. Rumsfeld ordering that these two plaintiffs, in particular, be treated as they allege they were treated. Either amendment should be enough to allow plaintiffs to proceed, but under the majority’s erroneous view of military immunity from Bivens liability, both amendments would be futile.
III. Qualified Immunity
In Mitchell v. Forsyth, the Supreme Court rejected absolute immunity for a former cabinet member who said he had acted to protect national security. Qualified immunity was sufficient: “ ‘Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate. ...’” 472 U.S. at 524, 105 S.Ct. 2806, quoting Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. 2727 (emphasis added in Mitchell). The panel concluded that plaintiffs had alleged violations of clearly *225 established constitutional law. Even the defendants do not seriously argue that prolonged deprivation of sleep, food, water, and adequate clothing, exposure to extreme cold, and hooded “walling” do not violate clearly established constitutional law. See Vance, 653 F.3d at 606-11. On rehearing, defendants have not disagreed with that analysis. (The argument they have labeled “qualified immunity” addresses only whether plaintiffs sufficiently alleged Mr. Rumsfeld’s personal responsibility.) The majority also does not question the substantive constitutional law or qualified immunity, so there is no need for further discussion of those points.

Conclusion

Our courts have a long history of providing damages remedies for those whose rights are violated by our government, including our military. In Little v. Barreme, 6 U.S. (2 Cranch) 170, 178-79, 2 L.Ed. 243 (1804), the Supreme Court held that the commander of a warship was liable to the owner of a neutral vessel seized pursuant to orders from the President but in violation of a statute. See also Iqbal, 556 U.S. at 676, 129 S.Ct. 1937, citing Dunlop v. Munroe, 11 U.S. (7 Cranch) 242, 268, 3 L.Ed. 329 (1812) (in ease against postmaster, federal official’s liability “will only result from his own neglect in not properly superintending the discharge” of his subordinates’ duties); Bivens, 403 U.S. at 395-97, 91 S.Ct. 1999 (collecting cases showing that damages against government officials are historically the remedy for invasion of personal interests in liberty, and quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803): “The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.”).
The majority’s grant of absolute civil immunity to the U.S. military for violations of civilian citizens’ constitutional rights departs from that long heritage. We leave citizens legally defenseless to serious abuse or worse by their own government. I recognize that wrongdoers in the military are still subject to criminal prosecution within the military itself. Relying solely on the military to police its own treatment of civilians fails to use the government’s checks and balances that preserve Americans’ liberty. The legal foundations for the claims before us are strong and in keeping with the Supreme Court’s decisions and the best traditions of American liberty and governance. We should affirm the district court’s decision to allow plaintiffs to try to prove their claims for torture.

. I continue to agree with the panel decision directing dismissal of the plaintiffs’ claims against the United States for deprivation of their property in No. 10-2442, adopted by Part II of the majority opinion. See Vance, 653 F.3d at 626-27.

. Among the cited cases, Newton, Meister, and Wright involved claims under 42 U.S.C. § 1983 against military officials in state National Guards, but the courts in those cases tracked the Bivens analysis under the Chappell, Stanley, and Feres cases discussed below.

. The majority cites Verdugo-Urquidez to show it is “not settled” whether the Constitution applies to interrogation outside the United States, ante at 198, but the majority ignores the fact that the party in that case was a non-resident alien, not a citizen or national of the United States. Reid and Munaf show it is well established that U.S. citizens do not abandon their constitutional rights with respect to their own government when leaving U.S. borders. This dicta from our court should most definitely not be used to justify a defense of qualified immunity by federal personnel who violate constitutional rights in overseas interrogations.

. Even the Fourth Circuit’s opinion in Lebrón did not go as far as the majority. Lebrón rejected Bivens claims by a U.S. citizen held in military custody after the President himself had designated the plaintiff an enemy combatant. First, the Lebrón court emphasized the enemy combatant designation. 670 F.3d at 549. Second, the plaintiff had dropped claims against the lower-level personnel with hands-on responsibility for his treatment. He was pursuing only high-level policy claims that raised "fundamental questions incident to the conduct of armed conflict.” Id. at 550. The plaintiffs in this case, by contrast, were employed by U.S. military contractors and were trying to help the FBI investigate corruption in the U.S. mission to Iraq. They assert claims that are perfectly consistent with U.S. law and stated military policy on interrogation techniques and treatment of prisoners. Plaintiffs contend here that the defendants violated military policy and U.S. statutes, as well as the Constitution.

. The majority’s discussion of Chappell and Wallace begins with what in football would be called a head-fake, suggesting mistakenly that because plaintiffs Vance and Ertel were civilians working for a military contractor, they might be deemed soldiers for purposes of Bivens, Chappell, and Stanley. Ante at 199. Under the statutes cited by the majority, plaintiffs could have been subject to civilian U.S. criminal law if they had been suspected of committing a crime in Iraq. See 18 U.S.C. §§ 3261, 3267(l)(A)(iii). Section 3261 does not treat them as soldiers or make them subject to military discipline or the Uniform Code of Military Justice. Also, of course, no one relied on section 3261 to detain plaintiffs, let alone to justify torturing them.

. The majority cites the Military Commissions Act of 2006, Pub.L. No. 109-366, § 7(a), codified as 28 U.S.C. § 2241(e), 120 Stat. 2600, 2635-36 (2006), enacted after Vance and Er-tel were in custody. In that Act, Congress prohibited federal courts from exercising jurisdiction over a civil claim by an alien "properly detained as an enemy combatant." That narrow prohibition clearly does not apply to Vance or Ertel, and the very narrowness of it indicates that Congress has not acted to bar actions like this one, by U.S. citizens who were not enemy combatants.

. Sections 536.42 and 536.45(h) apply to claims under both the MCA and the FCA. Even if those laws could apply to these plaintiffs' allegations, relief under the MCA and FCA is unlike the remedies in Sckweiker and Bush because it is left to the discretion of the Secretary of the Army or Defense and there is no right to judicial review. Also, plaintiffs Vance and Ertel probably would not have qualified as "inhabitants” of a foreign country *221 as required for the limited and discretionary relief under the FCA. See 10 U.S.C. § 2734(a).

. Justice Jackson’s reference in Eisentrager to the Apostle Paul fits surprisingly well with today’s case. See Acts 25:11 (Paul invokes Roman citizen's right to appeal to emperor); Acts 22:25-29 (Paul invokes his Roman citizenship as defense against being flogged before he was convicted of any crime); Acts 16:35-39 (upon being told he was free to leave prison, "Paul replied, 'They have beaten us in public, uncondemned, men who are Roman citizens, and have thrown us into prison; and now are they going to discharge us in secret? Certainly not! Let them come and take us out themselves.' The police reported these words to the magistrates, and they were afraid when they heard that they were Roman citizens; so they came and apologized to them.”).